**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| AIMIN WEN, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| BROOKE ROLLINS, as Secretary of the Department of Agriculture, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Aimin Wen and brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff alleges that Defendant Brooke Rollins, as Secretary of the Department of Agriculture, subjected Plaintiff to discrimination based on her race and national origin, and then subjected Plaintiff to retaliation after she engaged in protected activities, all in violation of Title VII of the Civil Rights Act, respectfully showing as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331, 1343, & 1391 and the enforcement provisions of Title VII of the Civil Rights Act.

2.

Venue is proper in this judicial district and the division of this Court because the events underlying this action occurred in Byron, Peach County, Georgia, which is located in this judicial

district and division, pursuant to 28 U.S.C. § 1391, 42 U.S.C. § 2000e-5(f)(3), and the Rules of this Court.

## PARTIES

### 3.

Plaintiff Aimin Wen (hereinafter, "Plaintiff" or "Dr. Wen") is a citizen of the United States and a resident of Georgia.

### 4.

At all times relevant times, Dr. Wen was considered a covered, non-exempt employee under Title VII of the Civil Rights Act.

### 5.

Defendant Brooke Rollins, as Secretary of the Department of Agriculture, (hereinafter, "Defendant") may be served by delivering or sending a copy of the Summons and Complaint to the United States Attorney for the Middle District of Georgia or their office's civil process clerk, with copies to the Attorney General of the United States and the Secretary of the Department of Agriculture, through their preferred agent for service, the General Counsel of the Department of Agriculture, located at 1400 Independence Avenue, Southwest, Washington, District of Columbia 20250-1150. *See* Fed. R. Civ. P. 4(i); 7 C.F.R. § 1.41.

### 6.

Defendant is a covered employer within the meaning of Title VII of the Civil Rights Act.

## STATEMENT OF FACTS

### 7.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 6, as if the same were set forth herein.

8.

Defendant hired Dr. Wen to serve as a Biological Science Technician (GS-07, Step 1) at Defendant's Agriculture Research Service Fruit and Tree Nut Research Unit, located in Byron Georgia (hereinafter, "Byron Facility").

9.

Dr. Wen started in this position on March 3, 2019.  Defendant hired Dr. Wen as a permanent, full-time employee, with a one-year probationary period.

10.

Soon after Dr. Wen began her tenure, she earned numerous work certificates and positive performance appraisals, both concerning Dr. Wen's work product and her workplace demeanor.

11.

Dr. Wen had over 20 years of research and laboratory experience prior to taking the position with Defendant.

12.

Dr. Wen is a woman of Asian dissent, who was born in China and immigrated to the United States in 2004.  In 2017, Dr. Wen became a naturalized citizen of the United States.

13.

Additionally, Dr. Wen had earned a Bachelor's of Science in Microbiology and Biochemistry from Hebei University and a Master's of Science in Microbiology from China Agricultural University, both located in the People's Republic of China.  Dr. Wen had also earned a Doctor of Philosophy in Microbiology from the University of Queensland in Australia.

14.

As a result, Dr. Wen met and far exceeded the qualifications for a Biological Science

Technician.

15.

When Dr. Wen was subsequently provided with a performance review for the period covering March 3, 2019 through September 30, 2019, Dr. Wen received the highest possible overall rating of "outstanding."  Based on that rating, Dr. Wen received a performance bonus award.

16.

During the entirety of her tenure, Christina Pisani (hereinafter, "Dr. Pisani")  served as a Research Horticulturalist (GS-12) and Dr. Wen's immediate supervisor.

17.

When Dr. Pisani and several other managers initially interviewed Dr. Wen, they noted that Dr. Wen "[w]orks good with other people," she had a "very good positive personality," and Dr. Wen had "good communication" skills.

18.

Additionally, when Dr. Wen was considering whether to take the offer for her position, and Dr. Wen requested a small pay increase to account for moving expenses to relocate to Georgia, Dr. Pisani submitted that request on Dr. Wen's behalf, justifying the request saying that Dr. Wen had a "[v]ery positive personally [sic] that will allow her to get along with others/great communication."

19.

On May 8, 2019, June 24, 2019, and September 3, 2019, Dr. Pisani provided Dr. Wen with her quarterly performance reviews, in which Dr. Pisani indicated that she was satisfied with how Dr. Wen treated her coworkers with respect.

20.

In the subsequent FY2019 performance review, Dr. Pisani certified that Dr. Wen "[t]reats others with consideration, respect, and fairness, and openly, consistently challenges bias, intolerance, and incivility."   Dr. Pisani also noted that Dr. Wen "[e]ffectively works with customers, peers or stakeholders from all backgrounds."

21.

When Dr. Wen earned a performance award in September 2019, her annual salary was increased by over $1,000.00.

22.

Despite this pay increase, Dr. Wen found that she was still making approximately $5,000.00 less than the five-year average of similarly situated white, American-born technicians at the Byron Facility.

23.

Dr. Wen also found that she was making between at least $10,000 to $15,000 less than one of her coworkers, Kirby Moncrief, a white, American-born man in the exact same position as Dr. Wen, also reporting to the same supervisor.

24.

Dr. Wen had comparable work experience as Mr. Moncrief.

25.

However, Dr. Wen's academic credentials were far superior to those of Mr. Moncrief.

26.

Similarly, as discussed further herein, when Dr. Wen was replaced by a white, American-born female with significantly less education and experience than Dr. Wen, that individual was

also paid a higher starting salary than what Defendant paid to Dr. Wen.

27.

Dr. Pisani had only been working at the Byron Facility for approximately five months prior to the beginning of Dr. Wen's employment.

28.

Dr. Pisani, a white woman who was born in Italy, was previously assigned to work at one of Defendant's facilities in Florida.  Dr. Wen later found out that Dr. Pisani had to leave the facility in Florida because she had a significant conflict with her own supervisor, a Molecular Biologist. Dr. Pisani also indicated that she left the Florida facility because one of the Research Technicians had given Dr. Pisani "insufficient respect."

29.

The Research Technician at issue was not under Dr. Pisani's supervision.

30.

Like Dr. Wen, both the aforementioned Molecular Biologist and Research Technician were born in China and are of Asian ancestry.

31.

Dr. Wen would frequently observe Dr. Pisani making inappropriate comments about people of Asian descent, and particularly those who originated from China.

32.

For example, Dr. Pisani would routinely say that "Chinese people can't drive."

33.

Dr. Pisani was also known to say on occasion that "Chinese people's English is really bad."

34.

There were also several occasions when Dr. Pisani observed other employees having conversations in the Mandarin Chinese language, and Dr. Pisani would complain about such use of the foreign language in the workplace.

35.

Dr. Wen and Dr. Pisani would at times discuss personal matters in the workplace.

36.

On one occasion, when Dr. Wen was researching medical providers in the area, she pulled up the biography of one dentist who happened to appear to be of Asian dissent. When Dr. Pisani saw the dentist's photograph, she told Dr. Wen, "I would never visit an Indian doctor because I had a bad experience with a different doctor who was Indian."

37.

Dr. Wen ultimately saw a dentist named Dr. Robert Bridges. When Dr. Pisani found this out and then searched for the dentist's profile, Dr. Pisani remarked, "[o]h, he is Asian. Look, he does not look nice." Dr. Wen did not understand Dr. Pisani's comment, particularly because Dr. Bridges was smiling in the photograph.

38.

Dr. Wen did not let the fact that she was very overqualified for her position bother her, and she was just happy to have the opportunity, which she planned to work until she was eligible to retire. However, Dr. Wen found on numerous occasions that she was not shown basis respect from her supervisor.

39.

For example, Dr. Pisani would generally introduce Dr. Wen to others, not using "Aimin"

or "Dr. Wen."  Rather, Dr. Pisani would merely refer to Dr. Wen as "technician" or "my technician."

40.

In fact, in the rare occasion in which Dr. Pisani would refer to Dr. Wen's name, she would go out of her way to avoid referring to her as "doctor," instead calling her "Ms. Wen."

41.

There were also numerous occasions when Dr. Pisani told Dr. Wen that, "I would never want to be a technician."

42.

Dr. Wen did not observe Dr. Pisani treating the other technicians this way, including when Dr. Pisani would always refer to Mr. Moncrief using his name.

43.

The kind of disrespect that Dr. Wen experienced from Dr. Pisani throughout her tenure was significant enough that Dr. Wen's relatives started to note a marked decline in her sense of self-worth and happiness.

44.

During the very first week of Dr. Wen's employment, and a person from Defendant's IT department who was creating Dr. Wen's credentials misspelled her name, refused to correct the issue, preventing causing Dr. Wen challenges logging into Defendant's systems the first few days of her employment.  Dr. Wen later told Dr. Pisani that she felt like she had been disrespected by the IT employee when she raised the issue, and she felt like the IT employee responded that way because Dr. Wen was Chinese.

45.

There had been several other instances in which Dr. Wen advised Dr. Pisani that she felt that differences in her cultural upbringing in China had not been respected by other employees.

46.

As a result, Dr. Pisani assumed that when Dr. Wen complained of being "disrespected," that Dr. Wen's actual grievance was of being subject to discrimination based on her ethnicity or national origin.

47.

By January 2020, Dr. Pisani's treatment of Dr. Wen had become so bad that, at one point, Dr. Wen told Dr. Pisani, "[t]his is not a competition!  You are the scientist, I am just a piece of shit technician, I'm already at the bottom."

48.

Part of the reason that Dr. Wen felt this way was because of some of the challenges she encountered in the workplace, such as having to take on part of Dr. Pisani's workload and Dr. Pisani refusing or being unable to assist Dr. Wen when such assistance was needed.

49.

For example, when Dr. Wen started her employment and had challenges using her new login credentials, Dr. Pisani had been out of the office for several days around that time to attend a wedding.

50.

While Dr. Pisani would have Mr. Moncrief order small items for the laboratory, Dr. Pisani would have Dr. Wen process orders that Dr. Pisani was aware were over the spending limit for Dr. Wen's position, requiring Dr. Wen to take additional measures to complete such tasks.

51.

While Dr. Pisani was supposed to be responsible for a certain instrument known as a "LiCor," Dr. Pisani refused to learn how to use the machine, and she instead sent Dr. Wen to a week-long training in Lincoln, Nebraska.

52.

At several points during her tenure, Dr. Wen was also required to share office space with other employees and even interns.

53.

Dr. Pisani would also require Dr. Wen to work long hours, and just prior to the holiday, Dr. Pisani gave Dr. Wen an assignment that required Dr. Wen to work through the 2019 Thanksgiving holiday.

54.

Unlike Dr. Wen's FY2019 annual appraisal, Dr. Pisani's ratings were not so stellar. Dr. Pisani told Dr. Wen that she believed she did not receive a better evaluation because she did not participate in multicultural activities. Dr. Pisani laughed at her conclusion, telling Dr. Wen that her family had joked that Dr. Pisani had multiculturalism because her technician (i.e., Wen) is Chinese.

55.

One of Dr. Pisani's duties in her role as the Chair of Defendant's Multicultural or Diversity Committee was to present on various cultural celebrations. Instead of making that presentation herself, Dr. Pisani would later ask Dr. Wen to prepare a presentation on Chinese New Year.

56.

Dr. Pisani was also the person designated at the Byron Facility to receive any employee

complaints for Defendant's Equal Employment Opportunity ("EEO") office.

57.

There were also several occasions when Dr. Pisani made comments about people of other racial or ethnic backgrounds.  On one occasion while discussing a current event, Dr. Pisani expressed disbelief in an allegation that two white people shot a black man.  Dr. Pisani also once commented that she "will never hire Black again, unless they graduated from Harvard or MIT."

58.

By around mid-January 2020, the COVID-19 pandemic had spread, the first case had been confirmed in the United States, and international authorities had declared a public health emergency.

59.

Around this same time, Dr. Wen perceived that Dr. Pisani had become even more hostile toward individuals of Chinese and Asian descent.

60.

For example, one day in early February 2020, Dr. Wen and a manager of Chinese dissent were having a brief discussion in Mandarin Chinese about the "coronavirus" (or "nova-corona" in Mandarin).  When Dr. Pisani heard the two speaking in their native language, about the global pandemic, Dr. Pisani loudly and dramatically slammed her office door.

61.

As a result of Dr. Pisani's treatment, Dr. Went eventually sought the number and contacted Defendant's Employee Assistance Program ("EAP").  Dr. Wen was provided with the local contacts for the EAP, but when she attempted to contact the local contacts, Dr. Wen was never able to reach anyone.

62.

After Dr. Wen was unable to make contact with the local EAP contacts, she decided to approach Dr. Pisani directly.  On January 23, 2020, Dr. Wen spoke to Dr. Pisani, specifically addressing Dr. Wen's concern that Dr. Pisani was not treating Dr. Wen as well as her white colleagues, and that Dr. Pisani was making Dr. Wen feel like "less of a person."

63.

Dr. Pisani did not appear to give much credibility to Dr. Wen's comments, merely brushing aside the complaint and denying treating Dr. Wen differently.

64.

Dr. Wen, mindful that she was approaching the end of her probationary period, went to see Dr. Pisani again on January 30, 2020.   Dr. Wen specifically asked whether Dr. Pisani had any concerns about Dr. Wen's performance or conduct.

65.

Dr. Pisani responded to Dr. Wen's January 30, 2020 inquiry, sating that Dr. Wen was "doing well" and that there were "no concerns" about Dr. Wen's job performance or conduct.

66.

After Dr. Pisani denied having any concerns about Dr. Wen's conduct or performance, Dr. Wen decided to use that moment to address some of the microaggressions and other incidents she believed were discriminatory throughout her employment.

67.

When Dr. Wen provided examples of what she perceived as microaggressions and discrimination, Dr. Pisani became visibly upset and she abruptly ended the conversation.

68.

Before the conversation ended, Dr. Wen advised of her belief that Dr. Pisani was being "disrespectful."

69.

Upon information and belief, after this conversation between Dr. Pisani and Dr. Wen, Dr. Pisani contacted her first-line supervisor, Research Leader David Shapiro-Ilan, Ph.D., and asked what Dr. Pisani needed to do to terminate Dr. Wen.

70.

On the afternoon of Friday, January 31, 2020, Dr. Pisani followed up with Dr. Shapiro-Ilan, as well as with Administrative Officer Tracy George to what Dr. Pisani needed to do to terminate Dr. Wen's employment.  When Dr. Pisani provided the bases for termination, Dr. Shapiro-Ilan asked her "[a]re you sure there is nothing else?"

71.

Based on Dr. Shapiro-Ilan's comment, it is apparent that Dr. Pisani did not offer a valid or sufficient basis to terminate Dr. Wen's employment at that time.

72.

On Monday, February 3, 2020, Dr. Pisani sent an email to an Employee Relations Specialist in Defendant's Personnel and Labor Solutions Branch, requesting that office provide a letter of termination for Dr. Wen, providing four examples as the alleged bases for Dr. Wen's termination.

73.

The first reason provided was a single day in which Dr. Wen had to call out of work because a sinus issue had caused Dr. Wen not to get any sleep the night before.

74.

The second reason provided describes the meeting several days earlier in which Dr. Wen told Dr. Pisani that she made Dr. Wen "feel less than a person" and like a "piece of shit technician."

75.

The third reason was when Dr. Pisani asked to "talk" to Dr. Pisani about moving their departure time for a trip the following morning by 15 minutes due to a medical condition, and that during the same meeting, Dr. Wen said she felt Dr. Pisani was being "respectful."

76.

The fourth reason provided was that Dr. Wen had arrived 10 minutes late and then complained about being treated poorly.  However, this event occurred on January 31, 2020, which was after Dr. Pisani had already contacted Dr. Shapiro-Ilan about the termination.

77.

On the morning of February 6, 2020, Dr. Wen was called into the conference room by Dr. Pisani.

78.

When Dr. Wen followed Dr. Pisani into the conference room, Dr. Wen saw a packet of papers laying face down on the table.

79.

Dr. Pisani walked to the other side of the table, told Dr. Wen to sit, and then she dramatically pushed the packet of papers over to Dr. Wen, revealing that there were termination papers.

80.

Dr. Pisani's demeanor during the meeting was both dramatic and manic, as though she

considered the termination of Dr. Wen to be a personal victory.

81.

The specific reason that Dr. Pisani gave for terminating Dr. Wen was "insufficient respect."

82.

Dr. Shapiro-Ilan was also in the room, but Dr. Wen's requests to speak with him after she had been advised of her termination were denied.

83.

Dr. Wen was able to remark that, while she is indeed an American, she felt like she was being terminated by the government because she is Chinese, and retaliatory in response to her complaints.

84.

Ten minutes after receiving her termination letter, Dr. Wen was being escorted by Defendant's security officials off the premises. At that time, there was a heavy downpour of rain, there was an active tornado warning in the area, and Defendant had issued several notification earlier in the day telling employees to seek cover and not go outside for their safety in the event of severe weather.

85.

The reasons that Defendant provided in its termination are false or are otherwise not the type of conduct that would normally result in termination.

86.

Moreover, Defendant did not afford Dr. Wen the opportunity to respond to the allegations about her performance and conduct, Defendant did not follow its normal procedures, and purportedly poor conduct was not addressed with Dr. Wen or any attempts at remediation in

advance of the decision to terminate, and under Defendant's own policies the alleged conduct should have resulted in a suspension of one to fourteen days.

87.

Upon information and belief, Dr. Pisani terminated Dr. Wen just prior to the expiration of Dr. Wen's probationary period because Dr. Pisani was aware that Dr. Wen would be entitled to additional protections once her probation was over, and it would therefore be much more of a challenge to terminate her employment.

88.

On July 22, 2021, Defendant replaced Dr. Wen with a white, American-born, younger woman named Mary Hart.

89.

Ms. Hart's highest level of education was a Bachelor's of Science, and she not only lacked the 20 years of experience that Dr. Wen had doing similar work, Ms. Hart had spent the prior seven years only serving as a caregiver to a relative.

90.

Still, Defendant offered Ms. Hart a higher starting salary than it had offered Dr. Wen.

91.

Ms. Hart's performance was also not acceptable.

92.

Dr. Pisani has acknowledged that Ms. Hart had problems with both her performance and her conduct for two-and-a-half months before Dr. Pisani took any actions to address the deficiencies.

93.

When Defendant did finally address the deficiencies in Ms. Hart's performance and conduct, Defendant afforded Ms. Hart certain process like being advised of the deficiencies and having the opportunity to respond.

94.

Dr. Pisani has also explained that Ms. Hart would argue frequently with Pisani.

95.

According to Dr. Pisani, Defendant was also aware that Ms. Hart was claiming and getting paid for periods of time when she was not actually working.

96.

Dr. Pisani described Ms. Hart as being incompetent in her job.

97.

The deficiencies in Ms. Hart's performance and knowledge specifically caused Defendant losses, including when Ms. Hart caused certain experimental data to become lost, resulting in a whole month of the team's work also being lost.

98.

While it is true that Defendant also terminated Ms. Hart's employment prior to the expiration of her probationary period, Defendant allowed Ms. Hart to continue working despite having noted several major deficiencies with her performance and conduct months earlier.

99.

Moreover, Dr. Pisani only terminated Ms. Hart's employment after Ms. Hart accused Dr. Pisani of discriminating against her.

Procedural Background

100.

On or about March 23, 2020, Dr. Wen made initial contact with an EEO counselor, alleging that Defendant had subjected Dr. Wen to discrimination and retaliation based on her participation in protected activities, in violation of Title VII of the Civil Rights Act.  After receiving notice of her right to file, Dr. Wen filed her formal complaint of discrimination alleging the same on May 8, 2020, and Defendant assigned this case number ARS-2020-07.

101.

After an administrative investigation and hearing conducted on several days in June through August 2022, an Administrative Judge issued its decision in favor of Defendant on each of Dr. Wen's claims in a decision on August 25, 2023.  Similarly, Defendant issued its Final Order adopting the Administrative Judge's decision in its entirety on August 30, 2023.

102.

Dr. Wen submitted her Notice of Appeal to the Equal Employment Opportunity Commission on September 27, 2023. On August 5, 2025, the EEOC's Office of Federal Operations issued its decision affirming Defendant's Final Order.

103.

Dr. Wen has exhausted her administrative remedies as to the aforementioned formal EEO complaint, and she is filing the instant action within ninety days of her receipt of the Decision issued by the EEOC's Office of Federal Operations.

## COUNT I:
## DISCRIMINATION BASED ON NATIONAL ORIGIN
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

104.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 103, as if the same were set forth herein.

105.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's national origin.  42 U.S.C. § 2000e-2(a).

106.

Plaintiff is considered in a protected class as she was born in the People's Republic of China.

107.

As alleged herein, Plaintiff was qualified for the position she held with Defendant and Plaintiff's performance was exemplary at all times.

108.

As alleged herein, Plaintiff was treated less favorably than her similarly situated coworkers who were born in the United States, or otherwise did not originate from China, including by assigning Plaintiff with tasks that were not expected of others in the same position, requiring Plaintiff to perform tasks for which her supervisor should have been responsible, refusing to afford Plaintiff with the disciplinary processes and procedures she was entitled, and ultimately terminating Plaintiff's employment over purported concerns about Plaintiff's conduct and performance that were not true.

109.

Moreover, Defendant replaced Plaintiff with an individual who was clearly less qualified than Plaintiff, but who had been born in the United States and had not originated from China.

110.

Defendant also offered Plaintiff's replacement a higher starting salary than Plaintiff, despite her inferior qualifications and experience.

111.

Despite having much more significant concerns about the conduct and performance of Plaintiff's replacement, Plaintiff's supervisor tolerated such conduct for several months prior to taking any remedial actions.

112.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory reason for the acts and omissions raised herein and for otherwise treating Plaintiff less favorably than her similarly situated counterparts who were born in the United States or did not otherwise originate from China.

113.

Plaintiff will prove that Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's national origin.

114.

Defendant's discriminatory animus based on national origin is evidenced, in part, based on the conduct and comments that Plaintiff's supervisor routinely made about individuals who originated from China and other Asian countries.

115.

Plaintiff has been injured by Defendant's discrimination based on national origin against her, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages, if available, in the amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT II:
## DISCRIMINATION BASED ON RACE
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

116.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 103, as if the same were set forth herein.

117.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's race.  42 U.S.C. § 2000e-2(a).

118.

Plaintiff is considered in a protected class because her race is Asian.

119.

As alleged herein, Plaintiff was qualified for the position she held with Defendant and Plaintiff's performance was exemplary at all times.

120.

As alleged herein, Plaintiff was treated less favorably than her similarly situated coworkers whose race was not Asian, including by assigning Plaintiff with tasks that were not expected of

others in the same position, requiring Plaintiff to perform tasks for which her supervisor should have been responsible, refusing to afford Plaintiff with the disciplinary processes and procedures she was entitled, and ultimately terminating Plaintiff's employment over purported concerns about Plaintiff's conduct and performance that were not true.

121.

Moreover, Defendant replaced Plaintiff with an individual who was clearly less qualified than Plaintiff, but whose race was white, not Asian.

122.

Defendant also offered Plaintiff's replacement a higher starting salary than Plaintiff, despite her inferior qualifications and experience.

123.

Despite having much more significant concerns about the conduct and performance of Plaintiff's replacement, Plaintiff's supervisor tolerated such conduct for several months prior to taking any remedial actions.

124.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory reason for the acts and omissions raised herein and for otherwise treating Plaintiff less favorably than her similarly situated counterparts whose race was not Asian.

125.

Plaintiff will prove that Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's race.

126.

Defendant's discriminatory animus based on national origin is evidenced, in part, based on the conduct and comments that Plaintiff's supervisor routinely made individuals from China and people of other Asian racial identities.

127.

Plaintiff has been injured by Defendant's discrimination based on race against her, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages, if available, in the amount of not less than $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT III:
## RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

128.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 103, as if the same were set forth herein.

129.

Under Title VII of the Civil Right Act, it is unlawful for an employer to retaliate against an employee because they have opposed any unlawful employment practice. See 42 U.S.C. § 2000e-3(a). Similarly, it is unlawful to retaliate against an employee who has made a charge, testified, assisted, or participated in an investigation or proceeding. *Id*.

130.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively. *See* 42 U.S.C. §§ 2000e & 2000e-1.

131.

As alleged herein, Plaintiff engaged in protected activities under Title VII when Plaintiff attempted, but was ultimately unable, to contact local representatives with Defendant's Employee Assistance Program in order to lodge a complaint about her supervisor's treatment that Plaintiff perceived as being discriminatory.

132.

As alleged herein, Plaintiff engaged in protected activities under Title VII when Plaintiff explicitly opposed her supervisor's treatment of her on or about January 23, 2020, which Plaintiff described as being discriminatory based on her race and national origin.

133.

As alleged herein, Plaintiff engaged in protected activities under Title VII when Plaintiff explicitly opposed her supervisor's treatment by providing examples of microaggressions and other discriminatory incidents throughout Plaintiff's employment on January 30, 2023.

134.

As a direct result of Plaintiff's January 23, 2020 and January 30, 2020 opposition to her supervisor's discrimination, Plaintiff's supervisor immediately decided to terminate Plaintiff's employment.

135.

Plaintiff was qualified for the position that she held, Plaintiff's performance had been satisfactory if not exemplary up to that date, and Defendant does not have any legitimate reasons as to why Plaintiff should not been able to continue in her position.

136.

As alleged herein, Plaintiff's direct supervisor was the individual who made the decision to terminate Plaintiff's employment, and this direct supervisor had been aware that Plaintiff had opposed her supervisor's discriminatory actions when she made the decision to terminate Plaintiff.

137.

Even if Dr. Shapiro-Ilan had been the individual who made the ultimate decision to terminate Plaintiff's employment, Dr. Shapiro-Ilan made this decision without having any personal knowledge as to Plaintiff's performance or conduct, and Dr. Shapiro-Ilan's decision was based entirely on the recommendation of Plaintiff's direct supervisor, who was motivated by discriminatory and retaliatory animus.

138.

Moreover, Dr. Shapiro-Ilan refused to speak with Plaintiff, even after Plaintiff made clear her belief that her termination was for discriminatory or retaliatory reasons.

139.

As a result, Defendant terminated Plaintiff's employment on February 6, 2020.

140.

Defendant's retaliatory animus is reflected, in part, because Plaintiff's supervisor had just provided Plaintiff with positive feedback just before she made the decision to terminate Plaintiff's employment as well as Plaintiff's prior performance reviews, and the supervisor only started discussing the termination on the day after or on the very same day as Plaintiff accused her supervisor of discrimination on January 30, 2020.

141.

The retaliatory nature of these actions is further reflected by the fact that Plaintiff's replacement was also terminated soon after she complained of her supervisor's discriminatory actions.

142.

The reasons that Defendant provided for terminating Plaintiff's employment were either false or they should not have otherwise been a valid basis for termination of an employee like Plaintiff.

143.

The false reasons that Defendant provided as the reasons for Plaintiff's termination were made solely as an attempt to hide the retaliatory nature of the situation.

144.

Causing an employee's employment to be terminated in response to a complaint or objection about workplace discrimination might well dissuade a reasonable worker from pursuing an EEO complaint or civil claims on the same.

145.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned conduct based on Plaintiff's participation in protected activities.

146.

Plaintiff has been injured by Defendant's retaliation, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of no less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aimin Wen respectfully prays for the following relief:

1) That Summons and Process be issued to Defendant Brooke Rollins, as Secretary of the Department of Agriculture, and that Defendant be served as provided by law;

2) That this matter be tried before a jury;

3) That judgment be awarded for and in favor of Plaintiff on Count I for discrimination based on national origin and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

4) That judgment be awarded for and in favor of Plaintiff on Count II for discrimination based on race and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

5) That judgment be awarded for and in favor of Plaintiff on Count III for retaliation, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act; and,

6) For such other relief as this Court shall seem just and proper.

*[Signature Page Follows]*

Respectfully submitted, this 3rd day of November, 2025.

KENNETH E. BARTON III
Georgia Bar No. 301171
M. DEVLIN COOPER
Georgia Bar No. 142447
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mdc@cooperbarton.com